HOYT *v.* FLEMING.

EXECUTORS AND ADMINISTRATORS—FRAUD.

On appeal from a decree dismissing plaintiff's bill against the administrator of her deceased husband's estate, charging fraud and conspiracy in the sale of real estate belonging to said estate, evidence *held*, insufficient to warrant disturbing the decree of the court below.

Appeal from Muskegon; Sullivan, J. Submitted January 31, 1918. (Docket No. 124.) Decided September 27, 1918.

Bill by Ada E. Hoyt against R. Andrew Fleming, individually and as administrator with the will annexed of the estate of Hiram J. Hoyt, deceased, Stella Emerson and John Emerson, to set aside a sale of real estate on the ground of fraud, and for an accounting. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Clink & Farmer,* for plaintiff.

*Cross, Vanderwerp & Foote,* for defendant Fleming.

*Carpenter & Jackson,* for defendants Emerson.

STEERE, J. Hiram J. Hoyt, an old resident and attorney of Muskegon, died on May 17, 1909, survived, as his heirs, by plaintiff, his widow, and Wilbur S. Hoyt, their son. He left some property of uncertain value, mostly incumbered, numerous creditors and a will which provided that after payment of his debts, funeral charges, etc., and a bequest of the proceeds of a $1,500 life insurance policy to his sister, Lute E. Hoyt, the remainder of his estate, if any, should become the property of plaintiff and their son Wilbur.

The will was duly admitted to probate, but the par-

ties named in it as his executors declined to act as such and on June 21, 1909, the probate court appointed as administrator of the estate with the will annexed defendant Andrew Fleming, who was an old acquaintance of the family, had formerly been in deceased's employ for several years and was somewhat familiar with his affairs. Fleming had at different times held official positions of trust and responsibility and when he accepted the appointment as administrator his business for some years, as he stated it, had been "real estate, loans and expert accountant," his principal work being the latter.

At the time of his death deceased's debts amounted to over $24,000, some $11,000 of which was secured by incumbrances on the most available of his assets. He had evidently been quite extensively interested in a number of unprofitable mining operations in the West, as the inventory of his estate, which was then appraised at about $28,000, contained numerous items of ventures in that line in which his stocks, aside from those hypothecated during his lifetime, were found to be worthless. After paying secured indebtedness, funeral expenses and for a monument to deceased amounting to $570, and a widow's allowance to plaintiff of $2,000, the proceeds from the remaining property of the estate was devoted to payment of the unsecured indebtedness and cost of administration. Liquidation proved slow and the estate had not been closed when this case was heard in March, 1917. Except the incumbered property which went to pay secured indebtedness, the assets of the estate were found to consist of a quantity of worthless mining stocks and some vacant land in the vicinity of Muskegon, for which there was then no demand or market, consisting of about 140 lots at Muskegon Heights and 11 acres of unimproved, sandy land situated beyond the eastern limits of the city, appraised in the inven-

tory of the estate at $1,100. While deceased had owned this tract for many years, it remained uninclosed and unimproved, covered with a growth of oak grubs, and had long been used by the public as a dumping ground.

Shortly after Fleming was appointed administrator he obtained a license from the probate court to sell the real estate, which he endeavored to do, with poor success for some time. He continued his efforts, however, selling lots in Muskegon Heights when purchasers could be secured, obtaining a license to sell real estate from the probate court each year. He testified, and it is not denied, that he repeatedly made varied efforts to sell the 11-acre tract, for which $1,200 was asked, as well as lots in Muskegon Heights; that he advertised the same for sale, personally solicited possible purchasers, and placed the property on the market with real estate agents. During the first four years he sold 48 lots in Muskegon Heights at prices ranging from $40 to $60 each. Plaintiff had a dower interest in this real estate not subject to the claims of creditors and was paid $5 for release of her dower in each lot when sold. In August, 1913, the price for these lots was raised to $65 which apparently stopped sales, as no lots were sold between that time and January, 1916. In December, 1915, an arrangement was made with a real estate dealer and agent named Rouse, who was interested in that locality, to handle the sale of those lots, by which as sold they were to realize to the estate $90 each and $10 each to plaintiff for her dower interest. Rouse testified that he advertised them in the paper at $110 each and took people to see them from time to time with poor success until along in May, 1916; and in June things picked up so he sold more lots that season than any year since; that he was "in the business not there only but all over"; and the price asked by the estate was then a

fair one in his opinion, for if he thought they were
cheap he "would have bought the whole smear," as he
had the money, and later he did buy some of those
lots for people who wanted them but did not have
the price to pay down, selling to them at an advance
on a small amount down and monthly payments of
$5 or $10.

Although the 11-acre tract was on the market at
$1,200 and repeated efforts were also made to sell it
to different parties, no one willing to pay that much
for it was found until April, 1916, when it was sold
for that price to defendant John Emerson who had a
desk in Fleming's office, and, as Fleming described his
position, "in matters of real estate sales and loans he
acts as sales manager. For his compensation he re-
ceives 50 per cent. of any commissions that are ob-
tained."

To effect a sale of this real estate it was necessary
for the administrator to not only secure permission
from the probate court but a release of her dower
interest from plaintiff. When asked to sign a release
she at first objected because of the price, as she had
at times when lots were sold, but ultimately did so,
accepting $100 therefor, the estate realizing $1,100,
which was the original appraisal of the property in
the probate proceedings. Emerson did not have the
money available to pay down on the purchase and
borrowed it from his wife, defendant Stella Emerson,
who had means and furnished the amount in cash or
its equivalent. The property was therefore first con-
veyed to her by Emerson's direction, and later, when
he decided to plat it, Emerson gave her other security,
as he testified, and she deeded it to him. It is undis-
puted that the sale was in fact made to Emerson. It
was thereafter duly reported to the probate court and
affirmed by it. In the summer of 1916 a marked in-
crease, or so-called boom, in demand and prices for

real estate developed in and around Muskegon, during which Emerson cleared up, platted, and profitably sold lots in this property.

On November 25, 1916, plaintiff filed this bill charging misconduct and fraud on the part of Fleming in handling the property of the estate as administrator, particularly in selling the Muskegon Heights lots at much below their true value and market price (which did not concern the defendants Emerson) ; and also charging that Emerson and Fleming, who were associated in business and as plaintiff believed copartners, well knowing the land was worth several times the amount for which Fleming as administrator sold it, conspired together with Mrs. Emerson to cheat and defraud plaintiff and said estate by effecting an administrator's sale of the property to Emerson through his wife for the joint benefit of Emerson and Fleming, and that the whole transaction was in bad faith, fraudulent and void. Her prayer for relief asks that all deeds to this 11 acres be declared void as between the parties hereto and set aside as to them with an accounting ordered relative to lots sold to innocent purchasers; that Fleming be "required to give account of said estate for any and all moneys that said estate has been defrauded of" by reason of his having sold other lands belonging to it for less than their fair value; that he be removed as administrator of said estate, and a personal decree be made against defendants as equity and justice require.

Defendants duly answered in denial of all charges of conspiracy, fraud, or other misconduct, particularly alleging as further grounds why plaintiff is not entitled to relief that Wilbur Hoyt, an heir of deceased, is not a party plaintiff nor made a defendant by said bill, and that the probate court has exclusive jurisdiction over the subject-matter of said suit.

Although upon the hearing and in plaintiff's testi-

mony the honesty of Fleming's conduct in selling the Muskegon Heights lots for the prices received was attacked and other charges of maladministration were made, aside from sale of the 11-acre tract those charges have apparently been abandoned, and it is now stated in the brief of plaintiff's counsel that the only question raised on appeal is "whether the sale made by Fleming, administrator, to his copartner or associate in business, Emerson, through his wife, was fraudulent." The presiding trial judge who heard the testimony of the witnesses taken in open court did not find that any of plaintiff's charges of conspiracy and fraud had been sustained and dismissed her bill of complaint.

The basis of plaintiff's charge of fraud as to this 11-acre tract is that Fleming and Emerson conspired together to defraud her and her husband's estate by its sale to the latter for their joint benefit and profit at a price far less than its then actual market value. For her to prevail this must be affirmatively shown by competent testimony. The fact that a subsequent boom in suburban property made a speculative possibility of higher prices a certainty and enabled Emerson to profit by his investment is immaterial if it was purely his sole purchase of the land at its then market value and Fleming had no interest in the transaction beyond selling this unproductive property of the estate as administrator at the best price then obtainable.

Defendants testify positively in denial of any such understanding, conspiracy, or fraudulent conduct as plaintiff charges. Both Fleming and Emerson say under oath that they were not copartners, bore no relations towards each other in this transaction except that of vendor and purchaser, and that Fleming never had any interest in the purchase nor in the profits therefrom. It is undisputed that this property was on the market at $1,200 and Fleming had repeatedly tried

to sell it to others likely to be interested at that price before he sold it to Emerson, and none of them would pay that much for it. During that winter he had made special effort to sell it, as others besides himself testified. P. P. Schnorback, an old resident of Muskegon who had dealt in real estate, testified that Fleming approached him several times and asked him to take it off his hands at $1,200 as he wanted to settle up the Hoyt estate and it was practically all they had left except some lots in Muskegon Heights; that such outlying property was of very small value until the spring of 1916 and he did not want it at that price but later told Fleming he was in a position to take it and was told it had been sold to Emerson; that if he sold it in April, 1916, for $1,200, the price previously given witness, it was a fair price at that time. Joseph Castenholz, a large owner and dealer in real estate, with experience of several years in platting and selling lots and who knew this property, was solicited by Fleming to buy it for $1,200 not long before the sale to Emerson and refused to consider it. He testified:

"I told him I didn't like the location and surroundings. I didn't like the kind of houses that were being built opposite it or in that direction, and it was on the other side of the railroad track. The roads to it were very deep sand and there was a piece of property right in front of it that kind of blocked it out, as I consider it. In fact, I didn't like the locality and didn't give it any consideration to speak of. I was in a position to have purchased it if it had appealed to me. * * * Considering the condition of this particular location and surroundings, I consider $1,200 all that it was worth one year ago. * * *

"I had property offered to me up there that might look low and I wouldn't touch it. That was the attitude of the public generally or dealers in real estate at that time."

But a week or so before Emerson bought it Fleming offered the property for $1,200 to John Ten Haven

who lives near and was familiar with it. Fleming had tried to sell it to him several times before without success. On this occasion Ten Haven called to inquire if it was still for sale. Fleming told him it had not yet been sold, that it was for sale at $1,200 and urged him to buy it, but Ten Haven did not accept the offer and left the office with no indication that he ever intended to. After that Fleming suggested to Emerson that he raise the money and buy it, which he concluded to do after consulting with his wife, who consented to let him have the money, his father-in-law and others, including John McLaughlin, an attorney and abstractor, in whom he had confidence, whose business gave him knowledge of real estate transactions and prices. McLaughlin testified that he knew this property was for sale, and when Emerson told him Fleming's price he replied that was about all it was worth, but that the conditions were beginning to brighten a little and perhaps he might be able to make a little something out of it, saying:

"I thought their price was reasonable. That was my judgment, based on my knowledge of values. * * * There wasn't any great desire for property situated as that was at that time; any great market— if you want to put it that way. The increase, of course, through the entire city of Muskegon, and through the city of Muskegon Heights, came in the summer of 1916, and has practically continued up to this time. I should say the big increase began to show itself in the month of June."

The charges of fraud in plaintiff's bill, filed after a marked activity in suburban real estate with enhanced values had occurred and this property had been cleared, platted, and much of it sold, are to be tested by conditions and values at the time the sale was made. The real issue is Fleming's good faith in making the sale of this land at that time for the price asked and paid.

The evidence is undisputed and conclusive that up to and including the time he last offered it to Ten Haven he, as administrator, was trying unsuccessfully to sell this unproductive asset of an apparently insolvent estate for the price he did sell it to the first person he found willing to pay that amount. He had a license to sell it from the probate court in which it had been appraised at the price he realized for the estate. He had no right as administrator to plat it on speculation in anticipation of a real estate boom, or to sell lots on time when creditors of the estate were waiting, as could a private owner. It is now evident, in the light of subsequent events, that he made a mistake and sold too soon, as many private owners weary of long holding unimproved real estate have done, and that in selling it to Emerson, with whom he officed and had business relations, he gave greater plausibility, as it turned out, to these charges; but to establish legal fraud it must be convincingly shown by competent testimony that he sold this property in bad faith for personal gain. It is claimed for plaintiff that this is shown by proof of existing conditions, prospects, active interest in and actual value of real estate existing at the time of the sale, but which defendants contend developed later. Upon that issue opinion testimony of persons claimed to have experience or knowledge was introduced by the respective parties.

Of the numerous witnesses called but two testified directly to a greater market value for this property than $1,200 at the time it was sold; one of them was Ten Haven, who was offered it at that price shortly before it was sold to Emerson, and to whom he then made overtures to purchase from him at an advanced price. Called as a witness by plaintiff, he said he considered the property worth "something like $3,000 at that time," although he told Emerson he "wouldn't consider $3,000," but "I thought $2,200 would be

enough." Emerson denies that he ever made any direct offer to him at any price, although requested to do so, and his own testimony does not disclose that he did more than inquire and suggest what he might do. He testified that he had just bargained to sell for $3,000 a 15-acre tract adjoining this, with a house and barn on it. What those improvements were worth he did not state, but being asked on cross-examination:

"When you found out that the price was $1,200, at the time you did talk with him (Fleming), did you consider that to be a fair price for that property?" he replied, "Well, I didn't know. I was acting for the man. The man had left town and I didn't see him again. I wasn't buying it for myself. I think it was a reasonable price."

Plaintiff's other witness who valued the property in excess of $1,200 when sold in April, first went to Muskegon in September, 1916, six months later, after it is conceded conditions and prices had radically changed. While the parties are at variance as to the exact time the activity in demand and marked advance in prices for outlying property started, it is undisputed that for several years before that time the reverse, and what is sometimes the result, of a boom prevailed. A witness called by plaintiff to testify that the stage of quick progress and activity in real estate was very marked in 1915 and the advance in values reached its height in 1916, which he stated indicated "an oversale or slackening up" in the fall, also testified of previous conditions in the real estate market that "there were thousands of lots thrown on the market by the tax sales," and witness bought tax lots at what he designates "the last sale of taxes, that is to say the homestead sale, * * * for around ten dollars," which he appraised at $300 when testifying in 1917. This would seem to indicate that dealing in such property, whether platted for resale or not, was, or at

least had been, to the owners whose thousands of lots were sold for taxes, a chance proposition, uncertain as to time and results.

The refusal of Wilbur S. Hoyt, an heir and residuary legatee, to join plaintiff in this litigation, and his expressed disapproval of her action cannot be regarded as entirely immaterial. He was a man of affairs of mature years, located and engaged in business in the west, on friendly terms with his mother, who at times had been with him there. When this suit was commenced without his knowledge and Fleming notified him of it, he sent to plaintiff at Muskegon a telegram dated San Francisco, December 4, 1916, as follows:

"Greatly shocked at receipt clipping, Chronicle, November 27th. I am sure your action is ill-advised and founded on false reports. We are victims of evil-minded people. My confidence in Fleming based on 40 years' friendship too strong to be influenced by such gossips. Please delay further action until receipt letter.                    WILBUR S. HOYT."

He also wrote to Fleming two letters on the subject of some length, disclaiming any previous knowledge of or consent to the proceeding, which he deprecated, and excusing his mother on account of her age, etc., saying in part:

"I have never had the slightest hint from my mother that she was at all dissatisfied with your handling of the affairs of the estate. On the contrary, she has always expressed to me her deep appreciation of your unselfish efforts, and we always joined in mutual congratulations in our extreme good fortune in having such a friend.  *  *  *  I am so greatly distressed that I am in no condition to discuss the matter with you, but I do want to ask that you be as charitable as possible toward my mother. Remember, Andrew, she is a woman of advanced years and while it is impossible for me to understand how any one or any number of people could have so deceived her as to lead her to take this action, I am sure that it must have been very strong influence.

"I shall not rest until you are completely vindicated. * * * If necessary I will make trip to Michigan, though it would be most inconvenient, as my partner is sick and my business demands my presence."

While his position in the matter could not affect her individual rights in this litigation, the fact that during all the time the estate was in probation she gave no intimation of dissatisfaction to her son, also interested as an heir and residuary legatee, with whom she was in close and friendly relations, presents at least an unusual situation and has some bearing on her mental condition and peculiarities of her testimony as to Fleming's alleged fraudulent conduct in recklessly sacrificing the property of the estate against her protests, not alone in the disposition of the 11 acres but in other particulars which have been abandoned. She testified strongly as to her amicable relations with her son, and said that after she commenced this suit and he wrote her, she then wrote him all the particulars, after which he did not object; that "the last letter from Wilbur was beautiful. He didn't mention it at all." Saying also of the suit:

"I never had said one word to Wilbur. I had kept it from him, and last winter when I was with him the six months I said every little while to myself, 'I ought to tell Wilbur but I guess I won't. He has got more than he can see to.' His partner was flat on his back and Wilbur was doing all the work himself."

Fleming was acting under authority of the probate court in handling this estate and making the sale. It was his duty to convert the assets into money for liquidation of its indebtedness and was licensed by that court to do so. He could make no valid sale until it had been reported to and approved by the court. Under the law it was the duty of the court before approving this sale to examine into the proceedings reported, with authority to examine witnesses under

oath, and determine if the proceedings were fair, for the interest of the estate and the price proportionate to the value of the property sold. Presumptively those steps were taken and the order of approval, from which no appeal was taken, based upon a determination by the probate court that the price was proportionate to the market value made at the time of the sale, when and where existing conditions were known and witnesses not necessitated to retrospectively testify of past events and values seen through the haze of an intervening activity and inflation in prices. To grant the relief asked for by plaintiff would be to ignore and in effect set aside this order of the probate court, made within the scope of its jurisdiction and not appealed from by any direct proceedings. It may at least be said such orders and determinations of the probate court are entitled to serious consideration, and not to be thus by indirection overruled without impelling reasons.

We are not able to conclude from this record, considered in its entirety, that the charges of conspiracy and fraud contained in plaintiff's bill are sustained by a preponderance of the evidence and find no occasion to disturb the decree of the trial court dismissing said bill. The same is therefore affirmed, with costs to defendants.

BIRD, BROOKE, FELLOWS, and STONE, JJ., concurred. MOORE, J., took no part in the decision. OSTRANDER, C. J., and KUHN, J., did not sit.